The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 23, 2026

**2026 COA 60**

**No. 25CA0631, *Bankers Insurance Co. v. Conway* — Insurance — Regulation of Insurance Companies — Acts of Producers — Unfair Business Practices — Unfair Competition and Deceptive Practices**

As a matter of first impression, a division of the court of appeals is asked to interpret section 10-3-131(1), C.R.S. 2025, and to decide whether its phrase "unfair business practices" is limited to the enumerated "unfair methods of competition" and "unfair or deceptive acts or practices" set forth in section 10-3-1104, C.R.S. 2025. The division concludes the phrase is not so limited and that sufficient evidence supports the agency order finding Bankers Insurance Company liable for the unfair business practices of its producers. The division further concludes that the term "financially responsible" in section 10-3-131(1) includes both restitution and fines. Finally, the division concludes that sufficient competent

evidence supports the Colorado Insurance Commissioner's finding that Bankers' producers committed unfair discrimination under section 10-3-1104(1)(f)(II).  The judgment is affirmed.

COLORADO COURT OF APPEALS       **2026 COA 60**

---

Court of Appeals No. 25CA0631
City and County of Denver District Court No. 22CV31403
Honorable Jill D. Dorancy, Judge

---

Bankers Insurance Company, a Florida corporation,

Plaintiff-Appellant,

v.

Michael Conway, The Colorado Commissioner of Insurance, in his official capacity and The Colorado Division of Insurance, an agency of the State of Colorado,

Defendants-Appellees.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE FREYRE
Kuhn and Bernard*, JJ., concur

Announced July 23, 2026

---

Neusch Law, Erik R. Neusch, Denver, Colorado, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Heather Flannery, First Assistant Attorney General, Denver, Colorado, for Defendants-Appellees


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 Plaintiff, Bankers Insurance Company (Bankers), appeals the district court's judgment affirming the order of the Colorado Insurance Commissioner (the Commissioner), one of the defendants in this case. As a matter of first impression, we are asked to interpret section 10-3-131(1), C.R.S. 2025, and to decide whether its phrase "unfair business practices" is limited to the enumerated "unfair methods of competition" and "unfair or deceptive acts or practices" set forth in section 10-3-1104, C.R.S. 2025. We conclude the phrase is not so limited and affirm the district court's judgment affirming the Commissioner's order.

## I.     Background

¶ 2 Bankers is an insurer, as defined in section 10-2-103(6.5), C.R.S. 2025, that is licensed by the Colorado Division of Insurance (the Division), this case's other defendant, and is authorized to conduct business in Colorado. As relevant here, Bankers acts as the surety for bail bond transactions. These transactions are handled by bail bond companies, which are "producers" as defined in section 10-2-103(6)(a). Bankers hires producers as independent contractors and grants them powers of attorney to act on its behalf

in accepting applications for bail bonds and posting those bonds with the court.

¶ 3     The General Assembly has empowered the Commissioner and the Division to review, evaluate, and analyze the "activities, operations, and affairs of all persons transacting the business of insurance in this state." § 10-1-301, C.R.S. 2025.  Acting under that power, the Division may perform a market conduct examination (MCE).  An MCE includes "any type of examination as set forth in the Market Regulation Handbook [(the Handbook)] that assesses a company's compliance with the laws, rules, and regulations applicable to the company." § 10-1-302(6), C.R.S. 2025.

¶ 4     In August 2019, the Division conducted an MCE of Bankers for the period between January 1 and December 31, 2018.  The examination process is statutorily prescribed and includes a Division examiner's review of a company's files and records, a predraft report conference between the company and the Division, the Division's issuance of a final report, and the option of a written hearing before the Commissioner.  § 10-1-304(5), C.R.S. 2025; § 10-1-305(5), (6)(a), (6)(c), C.R.S. 2025.  An MCE concludes with the

2

Commissioner's issuance of a final agency order. § 10-1-305(6)(c)(VII).

¶ 5    The Division reviewed 1,336 bail bond files, which included 32,865 executed bonds, written by sixty-eight of Bankers' producers. The Division also reviewed thirty-seven deeds of trust and Bankers' operations, advertising, forms, and rates, as well as complaints and claims against Bankers. Consistent with the Handbook, the Division applied an error tolerance level of 7% for claims and 10% for samples of other items. The final report identified fifteen producer errors (violations of law or regulation) that greatly exceeded the 7% and 10% error tolerance thresholds and recommended fining Bankers $153,105 pursuant to section 10-3-131(1).

¶ 6    As relevant to this appeal, the examiners identified the following producer errors.

| Market Conduct Issue | Description of Bankers' Violation |
|---|---|
| Issue A1 | Bankers' producers failed to deliver to customers and maintain an initial privacy notice or an annual privacy notice in violation of Division Regulation 1-2-14, 3 Code Colo. Regs. 702-1, and Division Regulation 6-4-1, 3 Code Colo. Regs. 702-6. |

3

| Market Conduct Issue | Description of Bankers' Violation |
|---|---|
| Issue A4 | Bankers' producers failed to hold a fiduciary account for premiums and/or handle premium funds in an appropriate manner in violation of section 10-2-704, C.R.S. 2025, and Division Regulation 1-2-1, 3 Code Colo. Regs. 702-1. Of the thirty-four producers' accounts examined, seven did not have a designated premium account, three did not use funds from the premium account to pay premiums, one producer did not keep enough money in the premium account to cover premiums owed, twenty-one producers commingled premiums with other funds, and eight producers had credit card payments for premiums deposited in an account other than the premium account. |
| Issue D1 | Bankers accepted bail bonds and paid commissions to unlicensed or unappointed producers in violation of sections 10-2-415.5 and 10-2-702, C.R.S. 2025, and Division Regulation 1-1-7, 3 Code Colo. Regs. 702-1. The examiners identified forty-five bonds written while the producer was not licensed as a casualty producer with the State of Colorado and ninety-nine bonds written while the producer was not appointed as a bail bond producer by Bankers with the Division. |
| Issue F1 | Bankers' producers failed to apply permissible rates in a nonexcessive and nondiscriminatory manner in violation of sections 10-2-707, 10-3-1104, and 10-4-403, C.R.S. 2025, as well as Regulation 1-1-7. Examiners identified 616 instances where producers charged a premium that was less than 15% of the bail bond amount during the period under examination. In 252 of those instances, the producer file did not contain any documentation to support charging less than 15%. Examiners also identified three instances where producers charged premiums ranging from 16% to 19% of the bail bond amount. |
| Issue G1 | Bankers failed to provide an accurate, complete premium receipt to the defendant or indemnitor in violation of section 10-2-705, C.R.S. 2025, and Regulations 1-2-14 and 1-2-20. Examiners identified errors in |

4

| Market Conduct Issue | Description of Bankers' Violation |
|---|---|
| | 959 premium receipts within the sampled producer files. |
| Issue G2 | Bankers failed to complete the collateral receipt accurately in violation of sections 10-2-705 and 18-13-130 and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.  Of the forty-seven instances in which collateral was taken in conjunction with the issuance of a bail bond, examiners identified thirty-eight errors. |
| Issue G3 | Bankers failed to complete the disclosure statement accurately and/or provide it to the defendant or indemnitor in violation of section 10-2-705 and Regulations 1-2-14 and 1-2-20.  Examiners identified errors with 686 disclosures. |
| Issue G4 | Bankers failed to complete the indemnity agreement accurately and/or provide it to the defendant or indemnitor in violation of section 10-2-705 and Regulations 1-2-14 and 1-2-20.  Examiners identified errors with 385 indemnity agreements. |
| Issue G5 | Bankers failed to maintain all documents required for and related to bail transactions in violation of section 10-2-705, 10-3-1104(1)(b)(I) and Regulations 1-1-7 and 1-2-14.  Examiners identified 235 files with missing documentation. |
| Issue G6 | Bankers' producers failed to return or timely return collateral to consumers in violation of sections 10-2-705 and 10-3-1104 and Regulations 1-2-14 and 1-2-20.  Of the forty-seven instances where collateral was taken, producers failed to return or fully return collateral after the bond was exonerated in a timely manner in twenty-seven instances. |
| Issue G7 | Bankers failed to complete the premium payment plan accurately in violation of section 10-2-705 and Regulations 1-2-14 and 1-2-20.  Examiners identified 92 errors out of the 141 payment plans. |
| Issue J1 | Bankers failed to timely reconvey or document deed of trust transactions in violation of sections 10-2-705, 10-2-707, 10-3-1104, and 18-13-130, C.R.S. 2025, and Regulations 1-1-7 and 1-2-14.  Of the deed of |

5

| Market Conduct Issue | Description of Bankers' Violation |
|---|---|
| | trust transactions examined, there were seventy-three violations identified that affected twenty-seven files when a deed of trust was obtained. |

¶ 7     Bankers requested a written hearing before the Commissioner, in accordance with section 10-1-305(6)(c), and challenged the twelve producer errors listed above.[1]  Bankers argued that section 10-3-131 did not apply because (1) it neither "knew [n]or should have known" about the producer errors; (2) none of the identified producer errors constituted "unfair business practices" as defined in section 10-3-1104; and (3) the phrase "financially responsible" in section 10-3-131 is limited to restitution and does not authorize fines.

¶ 8     The Commissioner issued a final agency order (the Order) in which it concluded that (1) because the error rates exceeded the thresholds set forth in the Handbook, Bankers should have known of them; (2) the phrase "unfair business practices" is not limited to the statutory definition but includes practices "reasonably implied";

[1] Bankers did not challenge Issues A2, A3, and A5, which addressed various operations and management issues.

and (3) the phrase "financially responsible" includes fines. The Commissioner adopted the Division's final report with slight modifications.

¶ 9 Bankers appealed the Order to the district court pursuant to sections 10-1-305(6)(c)(IX) and 24-4-106(4), C.R.S. 2025. It argued that there was no legal authority or support in the record to show that the producer errors were "unfair business practices," that insufficient evidence showed Bankers knew or should have known of the producer errors, and that section 10-3-131 was limited to restitution and did authorize fines or penalties.

¶ 10 The Commissioner responded that the term "unfair business practices," as used in section 10-3-131, was not limited to the practices listed in section 10-3-1104 because (1) section 10-3-131(1) uses the phrase "unfair business practices" while section 10-3-1104 uses the phrase "unfair methods of competition – unfair or deceptive practices" and (2) the legislative history supports this conclusion. Applying the statute's plain language and the district court's determination that the General Assembly's specific decision not to limit unfair business practices to those listed in section 10-3-1104, the district court affirmed the Order.

¶ 11     Bankers contends that the district court erred by (1) allowing the Commissioner to hold it liable for Bankers for unfair business practices of its insurance producers that are not defined in title 10, article 3, part 11 of the Colorado Revised Statutes; (2) concluding that "financially responsible" includes fines and is not limited to restitution; (3) finding that Bankers' producers committed unfair discrimination under section 10-3-1104(1)(f)(II); and (4) concluding that producers' paperwork errors violated section 10-3-1104(1)(b)(I) for Issues G4, G6, and G7.  We discern no error and affirm the district court's judgment affirming the Order.

## II.     Unfair Business Practices

¶ 12     Bankers contends that the term "unfair business practices" in section 10-3-131 is limited to those practices defined in section 10-3-1104 and that insufficient evidence supports the Order.  We disagree.

### A. Standard of Review and Applicable Law

¶ 13     A final agency order issued at the conclusion of an MCE is subject to review by a district court pursuant to sections 24-4-106 and 10-1-305(6)(c)(IX).  For purposes of appellate review, we "stand in the same position as the district court." *Info. Network for*

*Responsible Mining v. Colo. Mined Land Reclamation Bd.*, 2019 COA 114, ¶ 6. We must set aside an agency action that is arbitrary or capricious; a denial of a statutory right; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, purposes, or limitations; not in accord with the procedures or procedural limitations of title 24, article 4 or as otherwise required by law; an abuse or clearly unwarranted exercise of discretion; based upon findings of fact that are clearly erroneous on the whole record; unsupported by substantial evidence when the record is considered as a whole; or otherwise contrary to law, including failing to comply with section 24-4-104(3)(a) or 24-4-105(4)(b), C.R.S. 2025. § 24-4-106(7)(b). "In applying this standard, we presume the validity and regularity of administrative proceedings and resolve all reasonable doubts as to the correctness of administrative rulings in favor of the agency." *Gessler v. Grossman*, 2015 COA 62, ¶ 11, *aff'd*, 2018 CO 48.

¶ 14    An ultimate conclusion of fact is one involving a mixed question of law and fact that settles the rights and liabilities of the parties. *See Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1245 (Colo. 2001). On appeal, an ultimate conclusion of fact is reviewed

9

to "determine whether there is substantial evidence in the record as a whole" supporting that conclusion. *Koinis v. Colo. Dep't of Pub. Safety*, 97 P.3d 193, 195 (Colo. App. 2003). A reviewing court cannot reweigh the evidence or substitute its judgment for that of the agency. *Colo. Real Est. Comm'n v. Bartlett*, 272 P.3d 1099, 1102-03 (Colo. App. 2011).

¶ 15    An agency's conclusions of law are reviewed de novo. *Colo. Dep't of Lab. & Emp. v. Esser*, 30 P.3d 189, 193-94 (Colo. 2001). We are not bound by an agency's interpretation of its enabling statute or regulations; however, we may consider and defer to an agency's statutory interpretation when statutes have assigned authority and an expert role to the agency. *Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n*, 157 P.3d 1083, 1088 (Colo. 2007).

¶ 16    Statutory interpretation presents a question of law that we review de novo. *Nonhuman Rts. Project, Inc. v. Cheyenne Mountain Zoological Soc'y*, 2025 CO 3, ¶ 14.

¶ 17    When interpreting statutes, our primary goal is to effectuate the legislature's intent. *Id.* To do that, we start with the statutory language, applying its plain and ordinary meaning. *Id.* If the language is clear and unambiguous, we apply the statute as written

10

without regard to interpretive aids. *See id.* If the statute is ambiguous, we may look to, among other things, the legislature's intent, the circumstances surrounding the statute's adoption, the administrative construction of the statute, and the possible consequences of different interpretations. *Tucker v. Volunteers of Am. Colo. Branch*, 211 P.3d 708, 711 (Colo. App. 2008), *aff'd sub nom., Volunteers of Am. Colo. Branch v. Gardenswartz*, 242 P.3d 1080 (Colo. 2010).

¶ 18    A statute should be interpreted so as to give consistent, harmonious, and sensible effect to all of its parts. *Devora v. Strodtman*, 2012 COA 87, ¶ 9.

¶ 19    Section 10-3-131(1) provides:

> An insurer authorized to conduct business in this state, who knew or should have known about the unfair business practices of an insurance producer, may be financially responsible for the unfair business practices of the insurance producer, who, while acting on behalf of the insurer, engaged in unfair business practices that violate this title.

¶ 20    Section 10-3-1104 defines nearly fifty types of "unfair methods of competition" and "unfair or deceptive acts or practices." Additionally, section 10-3-1107, C.R.S. 2025, provides:

Whenever the commissioner has reason to believe that any person has been engaged or is engaging in this state in any unfair method of competition or any unfair or deceptive act or practice, whether defined or reasonably implied in this part 11, or has violated any other provisions of this title or any rule or lawful order of the commissioner and that a proceeding by the commissioner in respect thereto would be to the interest of the public, the commissioner shall proceed as provided in article 4 of title 24, C.R.S. Any final action by the commissioner pursuant to this section shall be subject to judicial review by the court of appeals pursuant to section 24-4-106(11), C.R.S.

## B. Analysis

¶ 21    We discern no error in the Order and conclude that the term "unfair business practices that violate this title [10]," as used in section 10-3-131(1), is not limited to the practices enumerated in section 10-3-1104.

## 1. Unfair Business Practices

¶ 22    First, we consider the plain language of section 10-3-131(1) and note that it contains no reference to section 10-3-1104. Had the General Assembly intended for "unfair business practices" to be limited to those practices listed in section 10-3-1104, it would have said so. We cannot add words or requirements to the statute that

12

the General Assembly did not intend. *People v. Diaz*, 2015 CO 28, ¶ 12. Moreover, section 10-3-1104 defines "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance," not "unfair business practices," and we must respect the legislature's choice of language. *People in Interest of B.C.B. v. A.B.*, 2025 CO 28, ¶ 25. The phrase "unfair business practices" itself is not defined in title 10. This disparate language, therefore, creates a statutory ambiguity that permits us to use other aids of statutory construction, including legislative history, to determine legislative intent. *State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000).

¶ 23    Second, the legislative history of House Bill 08-1228, 66th Gen. Assemb., 2d Reg. Sess. (Colo. 2008), which added section 10-3-131 to the Colorado Revised Statutes, shows that during the amendment phase, a legislator proposed adding language to the end of section 10-3-131 specifically referencing section 10-3-1104. Hearing on H.B. 08-1228 before the H. Comm. on Bus. Affs. & Lab., 66th Gen. Assemb., 2d Reg. Sess. (Feb. 19, 2008). The proposed amendment failed, and instead, the committee approved the legislation with language mentioning unfair business practices "as

13

defined in title 10." *Id.* This supports the Order's conclusion that "unfair business practices" is not limited to the definition found in section 10-3-1104 but instead refers to all of title 10, including section 10-3-1107.

¶ 24 Finally, the plain language of section 10-3-1107 authorizes the Commissioner to initiate proceedings when a person in the business of insurance has engaged in "any unfair method of competition or any unfair or deceptive act or practice, whether defined or reasonably implied in this part 11, or has violated any other provision of this *title* or any rule or lawful order of the [C]ommissioner." (Emphasis added.) As relevant here, title 10's legislative declaration requires insurance companies to abstain from deceptive or misleading practices. § 10-1-101, C.R.S. 2025. Additionally, section 10-3-1101, C.R.S. 2025, states that article 3, part 11 is intended to regulate trade practices in the insurance business by defining or determining which practices constitute unfair methods of competition and unfair acts or practices. Then, section 10-3-1107 permits the Commissioner to initiate proceedings for these unfair acts, whether defined or reasonably implied, for violations of the listed practices or "any other provision of this *title.*"

14

(Emphasis added.) Importantly, the legislature chose the word "title" and not "article," thereby expanding the violations the Commissioner could pursue beyond those specifically listed in section 10-3-1104. *Diaz*, ¶ 12. Therefore, limiting the term "unfair business practices" to the enumerated practices in section 10-3-1104, as argued by Bankers, would render the "reasonably implied" language in section 10-3-1107 meaningless. *See Devora*, ¶ 9 (we do not interpret a statute as to render any part of it either meaningless or absurd).

¶ 25 Accordingly, we conclude that "unfair business practices" is not limited to the enumerated list contained in section 10-3-1104.

2. Application to the Nine Challenged Issues

¶ 26 Next, we conclude that substantial evidence supports the Order's conclusions that Bankers' producers engaged in unfair business practices as identified in Issues A1, A4, D1, F1, G1, G2, G3, G5, and J1.

¶ 27 Title 10 protects defendants and indemnitors in the bail bond context by establishing regulatory requirements for bail bonds, defining the roles and obligations of the parties, and setting standards for business practices that safeguard the interests of the

defendants and indemnitors.  *See* § 10-1-101.  The unfair business practices for each Issue and supporting record are outlined below.

### a. Issue A1: Failure to Provide Privacy Notice

¶ 28    In all files reviewed by the examiners, Bankers' producers failed to deliver an initial privacy notice to their customers at the time the customers entered into a contract with Bankers, nor did they deliver an annual privacy notice to the customers with whom Bankers had a continuing relationship.  The failure to provide notices violated Division Regulation 6-4-1, 3 Code Colo. Regs. 702-6, and Division Regulation 1-2-14, 3 Code Colo. Regs. 702-1, which are lawful regulations promulgated by the Commissioner for the implementation and administration of the provisions of title 10.  *See* §§ 10-1-108(7), 10-1-109, 10-2-104, C.R.S. 2025.

### b. Issue A4: Premium Fiduciary Accounts

¶ 29    Bankers' producers failed to have or did not properly use the required fiduciary account in violation of section 10-2-704, C.R.S. 2025, as reasonably implied by part 11, and Division Regulation 1-2-1, 3 Code Colo. Regs. 702-1, a lawful regulation promulgated by the Commissioner.  *See* §§ 10-1-109, 10-2-104, 10-2-413, 10-2-417, 10-2-704, 10-16-414, C.R.S. 2025.  Of the thirty-four

16

producers' accounts, seven of the producers did not have a designated premium account; three producers did not use funds from the premium account to pay premiums; one producer did not keep enough money in the premium account to cover the premiums owed; twenty-one producers comingled premiums with other funds, and eight producers used credit card payments for premiums deposited in an account other than the premium account.

### c. Issue D1: Unappointed Producers

¶ 30    Bankers accepted business from producers who wrote bail bonds even though the producers were not properly appointed in violation of section 10-2-415.5, C.R.S. 2025, a violation reasonably implied by part 11.  Section 10-2-415.5(1) requires that

> [n]o insurance producers shall claim to be a representative or authorized or appointed agent of, or use any other term implying a contractual relationship with, a particular bail insurance company or accept applications on behalf of the bail insurance company unless the insurance producer becomes through a written contract a producer appointee, appointed by that bail insurance company in accordance with this section, to act in the capacity of an agent of the bail insurance company.

17

¶ 31    The examiners identified forty-five bonds written while the producer was not licensed as a casualty producer with the State of Colorado and ninety-nine bonds written while the producer was not appointed as a bail bond producer by Bankers with the Division.

### d. Issue F1: Application of Rates

¶ 32    Bankers' producers charged fees purported to be the fees paid to a court without sufficient documentation to show that the producers only charged consumers the amount paid to the court, in violation of sections 10-2-705 and 10-2-707, C.R.S. 2025, violations reasonably implied by part 11 and Division Regulations 1-1-7 and 1-2-14, 3 Code Colo. Regs. 702-1.

¶ 33    Also, Bankers' standard rate for bail bonds is 15%.  But of the 1,336 producer files reviewed, the examiners found 620 instances where the producers charged a premium that was either more or less than 15%.  Producers charged a premium rate less than 15% in 616 instances.  Of these, in 252 instances, the producers' files did not contain any documentation supporting charging less than 15%.  In three instances, producers charged premiums ranging from 16% to 19% of the bail bond amount, in excess of the statutory maximum premium rate.  *See* § 10-2-707(1).  Again, the producers

18

failed to provide documentation of the fees charged in addition to the premium charges.

### e. Issue G1: Premium Receipts

¶ 34      Bankers' producers issued consumers premium receipts that were not completed accurately in violation of section 10-2-705, a violation reasonably implied by part 11, and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.  Examiners found 2,695 instances, affecting 959 producer files, where the producers issued a premium receipt that was not completed accurately.

### f. Issue G2: Collateral Receipts

¶ 35      Bankers' producers took collateral bail bonds and issued consumers collateral receipts that were not completed accurately in violation of sections 10-2-705 and 18-13-130, C.R.S. 2025, violations reasonably implied by part 11, and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.  Examiners identified forty-seven instances in which collateral was taken in conjunction with the issuance of the bail bond.  In seventy-two instances, affecting thirty-eight forms, the producers issued a collateral receipt that was not completed accurately.  These violations often reflected multiple violations in a single form, included missing or incorrect

collateral amounts, missing or incorrect collateral descriptions, and missing the name or signature of the person pledging collateral.

### g. Issue G3: Disclosure Statements

¶ 36     The disclosure statements issued by Bankers' producers violated section 10-2-705, a violation reasonably implied by part 11, and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.  Specifically, examiners found that in 993 instances, affecting 686 individual disclosure statements, the producer issued a disclosure statement that was not completed accurately.

### h. Issue G5: Contracts and Receipts

¶ 37     Bankers' producers failed to provide the examiners with the files or the required forms for the bail bond transactions written for Bankers in violation of section 10-2-705, a violation reasonably implied by part 11, and Division Regulations 1-1-7 and 1-2-14, 3 Code Colo. Regs. 702-1.  The examiners reviewed or attempted to review a sample of 1,336 producer files.  In 292 instances, affecting 235 of those files, the producers failed to provide the selected file or failed to include required forms with such selected file.

### i. Issue J1: Deed of Trust

¶ 38    Bankers' producers failed to timely reconvey or document deed of trust transactions in violation of section 10-2-705, a violation reasonably implied by part 11.  Of the deed of trust transactions examined, there were seventy-three violations identified that affected twenty-seven files when a deed of trust was obtained.

¶ 39    Because each of the violations is supported by the record and documents numerous error rates above the threshold outlined in the Handbook, we discern no abuse of discretion in the Commissioner's finding that Bankers knew or reasonably should have known of these violations.  Thus, we conclude sufficient evidence supports the Order.

### III.    Meaning of "Financially Responsible" in Section 10-3-131

¶ 40    Bankers next contends that the term "financially responsible" in section 10-3-131(1) only authorizes the Commissioner to assess restitution and not fines.  We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 41    The standard of review and applicable law is articulated in Part II.A.

## B. Analysis

¶ 42    We first conclude that while the term "financially responsible" requires that insurers pay for producers' acts, the statute does not specify whether that payment must be restitution, as defined in section 10-3-105(4), C.R.S. 2025, or fines and penalties, under section 10-3-131. Both parties rely on legislative history to resolve this ambiguity and to support their arguments. Therefore, we examine the legislative history of section 10-3-131, which was promulgated in 2008 as part of House Bill 08-1228.

¶ 43    House Bill 08-1228 contained four sections. Section 1 gave the Commissioner the authority to order producers to pay restitution as a disciplinary action related to licensing violations in section 10-2-801(1), C.R.S. 2025, and specifically named restitution as a sanction. Section 2 authorized the Commissioner to order producers to pay restitution for violating their authority to conduct business in Colorado in section 10-3-105(4) and, again, specifically named restitution as a sanction. However, section 3 added the

term "financially responsible" to section 10-3-131(1) rather than the word restitution.[2]

¶ 44     Construing the statute as a whole and in a way that gives effect to all of its language, we conclude that the term "financially responsible" encompasses not only restitution but also fines. *See Burnett v. State Dep't of Nat. Res.*, 2015 CO 19, ¶ 12. Indeed, had the General Assembly intended to limit the term to restitution, it would have done so as it did in sections 10-2-801 and 10-3-105. *See Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 597 (Colo. 2005) (We "do not presume that the legislature used language 'idly and with no intent that meaning should be given to its language.'" (quoting *Carlson v. Ferris*, 85 P.3d 504, 509 (Colo. 2003))). And this interpretation is consistent with the statutory scheme that makes a licensed insurer responsible for the acts of its agents. *See* § 10-2-401(1), C.R.S. 2025.

¶ 45     We are not persuaded otherwise by Bankers' argument that the statements during the legislative hearings indicated an intent

---

[2] Section 4 established the effective date of the bill.

that all amendments relate only to restitution.  To be sure, restitution was discussed and specifically added to sections 1 and 2.  But in light of this discussion, its absence from section 3 reinforces our conclusion that the term "financially responsible" was intended to be more expansive and to include fines.  *See Nonhuman Rts. Project, Inc.*, ¶ 14.

¶ 46    We are also not persuaded that the Commissioner's authority to fine an insurer after an MCE under section 10-1-310, C.R.S. 2025, is mutually exclusive from the Commissioner's authority to fine a producer for the producer's unlawful conduct under sections 10-2-801(1) and 10-2-804(4), C.R.S. 2025.  Bankers provides no authority, nor are we aware of any, that precludes the Commissioner from pursuing penalties for violations from both the insurer and the producer or that precludes the Commissioner from pursuing penalties from one and not the other.

¶ 47    Further, section 10-2-801(1) states, "The [C]ommissioner may . . . order restitution to be paid from an insurance producer; or *assess a civil penalty* pursuant to section 10-2-804 or 10-3-1108," C.R.S. 2025.  (Emphasis added.)  Reading the statute as whole, we conclude that this language supports our interpretation.  *See People*

*v. Sexton*, 2012 COA 26, ¶ 16 (we read the language at issue in the context of the statute as a whole and the context of the entire statutory scheme).

¶ 48    Accordingly, we conclude that the fines imposed by the Commissioner were authorized under section 10-3-131(1) and that the term "financially responsible" includes fines and restitution.

IV.    Unfair Discrimination Practices

¶ 49    Bankers next contends that insufficient competent evidence supports the Commissioner's finding that Bankers' producers committed unfair discrimination under section 10-3-1104(1)(f)(II) in Issues F1 and J1.  We disagree.

A. Standard of Review and Applicable Law

¶ 50    The standard of review is articulated in Part II.A.

¶ 51    Section 10-3-1104(1)(f)(II), C.R.S. 2025, prohibits

> [m]aking or permitting any unfair discrimination between individuals of the same class or between neighborhoods within a municipality and of essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance, or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.

¶ 52     Section 10-2-707 states, in part, that "[a]n insurance producer who writes bail bonds shall not charge a premium or commission of more than the greater of fifty dollars or fifteen percent of the amount of bail furnished."

¶ 53     Section 10-4-403, C.R.S. 2025, states in part:

> (1) Rates shall not be excessive, inadequate, or unfairly discriminatory. . . .
>
> . . . .
>
> (c) Concerning unfair discrimination, unfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses.  A rate is not unfairly discriminatory solely if different premiums result for policyholders with like loss exposures but different expenses, or like expenses but different loss exposures, so long as the rate reflects the differences with reasonable accuracy.  Additionally, the provisions of section 10-3-1104(1)(f) shall apply.

## B. Analysis

### 1. Issue F1

¶ 54    We conclude that substantial evidence supports the Commissioner's finding that Bankers charged unfair discriminatory rates.[3]

¶ 55    The Commissioner found and the record shows the following:

- Examiners identified 616 instances where producers charged a premium that was less than 15% of the bail bond.

- In 252 of those 616 instances, the producer file did not contain any documentation to support charging less than 15%.

- In 364 of those 616 instances, the producer file contained a pre-printed rate deviation form that had one or more boxes marked. The rate deviation form states

---

[3] We agree with the Commissioner that Bankers has waived any challenge to its responsibility for the unfair business practices of its producers for noncompliance with sections 10-3-1104 and 10-4-403, C.R.S. 2025, as to Issue F1. We find those issues abandoned and do not address them further. *See Brody v. Hellman*, 167 P.3d 192, 199 (Colo. App. 2007) (if an issue is not pursued before the district court through disposition, the appellant has abandoned it).

that the standard rate for Bankers' bail bonds is 15%. Bankers tells its producers that "[t]his form must be completed by the Producer each time premium is charged that is less than fifteen (15%) percent." However, the forms did not contain sufficient information for the examiners to confirm that a reduction in premium from 15% of the bond amount was appropriate, why it was appropriate, or what the percentage should have been. For the remaining 252 bonds, there was no rate deviation form or any other documentation discussing charging a rate below 15%.

¶ 56 The Commissioner also concluded that Bankers' producers charged disparate rates irrespective of actual risk. It identified three identical rate deviation sheets for $5,000 bonds showing that each defendant was charged rates between 6% and 10% with "market considerations" listed as the basis for each deviation. However, the Commissioner found that "the [r]ate [d]eviation [s]heets for all three defendants are identical and the risk for all three defendants appears to be the same." The Commissioner concluded that absent additional documented information, "no

purported justification can be discerned as to [the difference in premium rates charged] or whether these more favorable rates were offered in a nondiscriminatory manner."

¶ 57    We are unpersuaded by Bankers' argument that the examiners "did nothing to ascertain whether the charges were based on anything other than the producers' individualized assessment of risk and market factors . . . . [T]he producers' files contain voluminous information relating to the particular risk of each defendant which was used in determining the rate to be charged." Bankers provides no citations to the record for this information, and "we will not comb the record for facts supporting plaintiff's arguments that were not cited in [the] brief." *Cikraji v. Snowberger*, 2015 COA 66, ¶ 10.

¶ 58    Accordingly, we conclude that the Commissioner's unfair discrimination findings for Issue F1 are supported by substantial evidence in the record.

### 2. Issue J1

¶ 59    Next, we conclude that substantial evidence supports the Commissioner's finding that Bankers' producers engaged in unfair

discrimination by requiring collateral exceeding the bond amount, Issue J1.[4]

¶ 60    Section 18-13-130(1)(e)(II) prohibits taking collateral or a security interest in real property "by deed or any other instrument unless the interest in the property is limited to the amount of the bond."

¶ 61    The Commissioner found that a review of thirty-seven deeds of trust revealed an error with twenty-five of them.  Errors included the taking of collateral that exceeded the bond amount.  The Commissioner found that the files "contained no documentation supporting the justification for requiring collateral far in excess of the bond amount."  Further, Bankers "fail[ed] to point to details from any of their producers' files or its policies or procedures for its appointed producers that demonstrated how its appointed

---

[4] We agree with the Commissioner that Bankers did not challenge its conclusion that Bankers' producers recorded deeds of trust exceeding the bond amount or failed to document these transactions in violation of sections 10-2-705 and 18-13-130, C.R.S. 2025.  Therefore, we do not to address these arguments. *Ortiz v. Progressive Direct Ins. Co.*, 2024 COA 54, ¶ 39, *aff'd*, 2026 CO 40.

producers ensure that for a similar risk the same contract terms are offered and provided by the customer."

¶ 62 We reject Bankers' contention that there was no evidence to support this finding. The record contains bonds where the aggregate of the promissory notes and multiple recorded deeds of trust securing the promissory notes exceeded the bond amount. And in one instance, the amount of indebtedness documented in deeds of trust totaled four times the amount of the bond without documented justification.

¶ 63 Accordingly, we conclude that the Order's findings regarding Issue J1 are supported by substantial evidence in the record.

## V. Paperwork Errors

¶ 64 Bankers last contends that paperwork errors in Issues G4, G6, and G7 do not violate any of the specific unfair business practices listed in section 10-3-1104 and that the Commissioner erred in interpreting provisions of the statute to conclude otherwise. But, as argued by the Commissioner, Bankers does not challenge the Order's conclusion that Bankers is responsible for its producers' unfair business practices that violated section 10-2-705 and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1,

which Issues G4, G6, and G7 were found to violate. And the exceptions and penalties assessed for these violations are the same as were assessed for the violations under section 10-3-1104. Therefore, we conclude that this issue is moot.

### A. Standard of Review and Applicable Law

¶ 65 We review de novo whether an issue on appeal is moot. *DePriest v. People*, 2021 CO 40, ¶ 8. "An issue is moot when a judgment, if rendered, would have no practical legal effect on the existing controversy." *In re Marriage of Tibbetts*, 2018 COA 117, ¶ 8 (quoting *In re Marriage of Dauwe*, 148 P.3d 282, 284 (Colo. App. 2006)).

### B. Analysis

¶ 66 For Issues G4, G6, and G7, Bankers' only challenge to the Commissioner's findings concerns the producers' violations of section 10-3-1104. For each of these issues, Bankers' producers violated several statutory and regulatory provisions, each of which can independently support the fine imposed.

¶ 67 As previously stated, the Commissioner found the following:

- Regarding Issue G4, Bankers is responsible for its producers' violations of sections 10-2-705 and 10-3-

1104(1)(b)(I) and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.

- Regarding Issue G6, Bankers failed to return collateral or return collateral in a timely manner in violation of sections 10-2-705 and 10-3-1104 and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.

- And regarding Issue G7, Bankers failed to complete the premium payment plan accurately in violation of section 10-2-705 and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1.

¶ 68　Bankers does not appeal the Commissioner's finding that it is responsible for its producers' unfair business practices that violate section 10-2-705 and Division Regulations 1-2-14 and 1-2-20, 3 Code Colo. Regs. 702-1, in Issues G4, G6, or G7. Therefore, regardless of whether Bankers is successful in arguing that Issues G4, G6, and G7 do not violate section 10-3-1104, the same number of violations and penalties would apply. *See In re Marriage of Tibbetts*, ¶ 8. Accordingly, we deem this contention moot.

## VI.   Disposition

¶ 69    The judgment is affirmed.

JUDGE KUHN and JUDGE BERNARD concur.